IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LUKAH C. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LUKAH C. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
CYNTHIA C., APPELLANT, AND JUAN B. ET AL., APPELLEES.

Filed December 12, 2023.   No. A-23-300.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Nicole J. Tegtmeier for appellant.

Jackson Stokes, Deputy Douglas County Attorney, for appellee.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

### INTRODUCTION

Cynthia C. appeals the order of the separate juvenile court of Douglas County that continued temporary protective custody of her son, Kaivian C., with the Nebraska Department of Health and Human Services (DHHS), and excluded placement with her. She challenges the court's finding that there was sufficient evidence to show that removing Kaivian from her home was necessary and that reasonable efforts were made to preserve the family prior to his removal. For the reasons that follow, we affirm.

### BACKGROUND

Cynthia is the biological mother of Kaivian, a minor child born in December 2021. Cynthia has four other children who were all in the custody of DHHS when Kaivian was born.

Given Cynthia's prior issues with her other children and history of substance abuse, upon Kaivian's birth, the State filed its fourth supplemental petition in the juvenile court alleging that Kaivian lacked proper parental care by reason of the fault or habits of Cynthia and was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the State alleged:

[Kaivian] lacks proper parental care by reason of the fault or habits of [Cynthia], mother of said juvenile, to wit:

(a) [Cynthia] is under the jurisdiction of the Douglas County Juvenile Court under docket JV 19-1352.

(b) [Cynthia] has a history of substance abuse issues.

(c) [Cynthia] is currently participating in inpatient substance abuse treatment at Family Works.

(d) [Cynthia] has not alleviated the issues for which she is under the jurisdiction of the Douglas County Juvenile Court.

(e) Due to the above allegations, said juvenile is at risk for harm.

The State also filed an ex parte motion for immediate temporary custody asking the court to place Kaivian in the custody of DHHS, with placement to exclude Cynthia's home, but to allow Kaivian to live with Cynthia in a treatment center. The juvenile court granted the motion.

On December 21, 2021, a first appearance and protective custody hearing was held and Cynthia entered a plea of denial to the allegations in the fourth supplemental petition. Kaivian remained in the custody of DHHS and was placed with Cynthia at a treatment center.

On March 22, 2022, the court entered an order for change of placement allowing Cynthia to be discharged from the treatment center and to transition into her own housing. The court further ordered that Kaivian would be allowed to transition with Cynthia into her own housing.

On August 4, 2022, the State filed an amended fourth supplemental petition which added an allegation that Cynthia engaged in domestic violence in Kaivian's presence. The State also filed an ex parte motion for immediate custody asking that DHHS take temporary custody of Kaivian and that his placement exclude Cynthia's home. The juvenile court granted the motion and Kaivian was removed from Cynthia's care.

The additional allegation asserting that Cynthia engaged in domestic violence in Kaivian's presence concerned Cynthia's ongoing relationship with Mandy W. Cynthia and Mandy had been involved in an on-and-off romantic relationship for 3 years. Despite their longstanding affiliation, DHHS did not become aware of their relationship until July 2022. Likewise, DHHS was unaware that Mandy was living in Cynthia's home. This presented an issue because Mandy was not approved by DHHS to reside with Kaivian.

Upon discovering that Mandy was living with Cynthia and Kaivian, DHHS conducted a background check on her. The background check revealed that Mandy had a significant criminal history and history of substance abuse. Her criminal history included five DUIs, with at least one in the last 5 years, along with convictions for possession of illegal substances and multiple assaults. Additionally, it was discovered that Mandy had been involved with DHHS regarding her own children. Most significantly, the background check revealed that Mandy had been incarcerated for destruction of Cynthia's property in July 2022. It was the discovery of this recent incident that prompted the State to file the amended fourth supplemental petition on August 4, 2022.

Police reports of the incident indicated that on July 31, 2022, with Kaivian present, Cynthia and Mandy had an argument that involved physical pushing. After Mandy attempted to get into Cynthia's apartment by breaking a window, Cynthia called law enforcement to remove her. It was reported that after the altercation, Mandy had two bruises and scratches on her arms. As a result of this incident, Mandy was arrested and ordered to have no contact with Cynthia. Notably, this was the second time an incident like this had occurred between Cynthia and Mandy. Although it is not clear when the first incident happened, it involved Mandy breaking a window during some sort of dispute.

When DHHS asked Cynthia about the July 31, 2022, incident, she denied that any physical altercation occurred. Instead, she told DHHS that Mandy accidentally broke a window with her foot when trying to get her attention from outside. She later told a different story of how she did not know who broke the window and that is why she called the police. More so, several days later, Cynthia told her case manager that she did not know about the no-contact order and that Mandy was watching Kaivian while she attended her therapy session. The July 31 incident, along with Cynthia's continued contact with Mandy, concerned DHHS.

In August 2022, the juvenile court held a first appearance and protective custody hearing on the amended fourth supplemental petition. Cynthia entered a plea of denial to the allegations. The court subsequently entered an order finding that it was in Kaivian's best interest to remain in the temporary custody of DHHS, to exclude Cynthia's home, and ordered that she participate in supervised visitation.

Several weeks later, DHHS became aware of another incident between Cynthia and Mandy that had occurred on August 23, 2022. While the record is not entirely clear as to what happened, there seems to have been a car accident involving Cynthia and Mandy. Cynthia initially stated that Mandy was driving her car at the time of the accident, but later stated she was the one who was driving. The accident caused some sort of altercation between them which escalated throughout the night. Eventually, police were called and Mandy was arrested for domestic abuse. Cynthia cooperated with the prosecution and expressed that she was willing to testify if necessary.

Mandy remained in jail on the domestic abuse charge until October 24, 2022. While Mandy was incarcerated, DHHS workers informed Cynthia that they were concerned about her continued contact with Mandy and emphasized the importance of her being honest with them. Despite this, Cynthia and Mandy spoke on the phone 20 to 30 times while Mandy was in jail. After Cynthia was informed that DHHS would access the jail phone logs, the calls ceased. However, it was revealed that Cynthia maintained contact with Mandy in jail through Mandy's family.

Once Mandy was released from jail, Cynthia continued contact with her. Cynthia informed DHHS in November 2022, and again in December, that she was still in contact with Mandy. As a result, on December 20, 2022, the juvenile court issued an order barring Mandy from having contact with Cynthia's children, which included Kaivian. In January 2023, Mandy posted a picture to Facebook that appeared to show her in Cynthia's kitchen. Then in February, a family support worker reported that Mandy visited Cynthia's apartment. Notably, Cynthia did not have custody of Kaivian at this time and there was not a court order barring Cynthia and Mandy from having contact. But as their relationship continued, so did DHHS' concerns.

On February 6, 2023, the State dismissed the amended fourth supplemental petition and filed a fifth supplemental petition, later amended by interlineation to a sixth supplemental petition.

This petition added an allegation that Cynthia continued to have ongoing contact with Mandy. Specifically, the sixth supplemental petition alleged:

> [Kaivian] lacks proper parental care by reason of the fault or habits of [Cynthia], mother of said juvenile, to wit:
>
> > (a) [Cynthia] is under the jurisdiction of the Douglas County Juvenile Court under docket JV 19-1352.
> >
> > (b) [Cynthia] has a history of substance abuse issues.
> >
> > (c) [Cynthia] has not alleviated the issues for which she is under the jurisdiction of the Douglas County Juvenile Court.
> >
> > (d) [Cynthia] engaged in domestic violence in the presence of said juvenile.
> >
> > (e) [Cynthia] continues to have ongoing contact with Mandy [W.], and
> >
> > (f) [D]ue to the above allegations, said juvenile is at risk for harm.

On the same day, the State filed an ex parte motion for immediate custody of Kaivian with placement to exclude Cynthia's home and the court entered an ex parte order for immediate temporary custody.

A first appearance and protective custody hearing was held on February 14 and 24, 2023. The State called two witnesses: Allyson Hoover and Ashley Starostka. Prior to Kaivian's birth, Hoover was the case supervisor for Cynthia and her other children from August 2019 through December 2020. Beginning in August 2021, she was Cynthia's secondary case manager until June 2022. Notably, she was in this position when Kaivian was born in December 2021. She then served as Cynthia's case manager during July and August 2022. Starostka became Cynthia's case manager in September 2022.

In describing why Cynthia's continued contact with Mandy was concerning, Starostka stated:

> It's a concern because it's an active safety threat, and it's been a concern since the beginning of this case. After reviewing the case in its entirety, for the most part, and reviewing past information, Cynthia has not demonstrated or does not have insight regarding how having those relationships could put her children in unsafe situations.

In addition, Hoover explained there were also concerns that Cynthia's relationship with Mandy would trigger her substance abuse problems. Cynthia tested positive for alcohol in August 2022 and had been reportedly drinking when the July 31 and August 23 domestic violence incidents occurred. Starostka later explained that a portion of these concerns also stemmed from Cynthia's relationships with Mandy's mother and sister who also have substantial histories of substance abuse. While Mandy was no longer barred from contacting Cynthia and DHHS had never told Cynthia she could not contact Mandy's family, given Cynthia's history of addiction, Starostka felt that Kaivian's safety was at risk if Cynthia maintained these relationships.

Starostka was also particularly worried about Cynthia's lack of progress in developing healthy relationships and the long-term impacts of domestic violence on Kaivian. Specifically, she stated: "[Cynthia] has engaged in all of these services, yet we are still at the same place and having the same conversations and essentially the same concerns regarding those relationships and setting up informal supports and understanding the difference between a healthy relationship and an

unhealthy relationship." Most notably, Starostka was concerned that despite successfully completing multiple domestic violence classes, Cynthia was still in contact with Mandy.

Starostka also outlined other problems that Cynthia was experiencing. On December 22, 2022, Cynthia was discharged from therapy due to lack of progress, missed therapy sessions, and consistent tardiness. Then on December 27, the visitation agency working with Cynthia and her five children discharged her as a client due to lack of progress and lack of follow-through with disciplining the children during visits. Visitation workers reported the children physically assaulted each other and the workers with minimal redirection by Cynthia. Starostka attempted to secure visitation services from another agency, but the 36 visitation agencies in Nebraska declined their services due to safety concerns.

Starostka felt that the combination of all these problems posed risks to Kaivian's safety. When asked to outline the exact safety threats posed by Cynthia's conduct, Starostka listed numerous problems that made her question Cynthia's suitability to care for Kaivian. These problems included the risk of domestic violence, the lack of follow-through in parenting skills, the lack of follow-through in disciplining the children when they are physically aggressive with one another and visitations workers, and the inability to provide structure and routine for Kaivian. The list continued with Starostka citing Cynthia's problems with resource management and being able to support herself without outside influence or support. She was also concerned about Cynthia's ability to raise five children without that additional support and her ability to maintain sobriety given the people she was surrounding herself with.

Starostka also spoke about the difficulties in managing Cynthia's case. She reported that Cynthia is routinely inconsistent with her and other DHHS workers. She tells different things to different people so there is constant chaos in orchestrating her case plan. Cynthia told Starostka that she signed certain medical release forms so the caseworker could contact the medical provider about Cynthia's prescription for amphetamines. However, the provider said that the releases were never signed. Similar problems with retrieving information arose with Cynthia's domestic violence classes, therapy, and narcotics anonymous courses. Starostka described managing Cynthia's case as "never-ending chaos."

On March 17, 2023, the juvenile court issued its order. The court found Starostka and Hoover's testimony to be credible and stated that the court "heard extensive testimony regarding the nature of the mother's ongoing relationship with Mandy [W.], including domestic violence and dishonesty from [Cynthia]." The court went on to find the State demonstrated that Kaivian's best interests were not served by having him reside with Cynthia. Instead, it was in his best interests to remain in the temporary custody of DHHS and that the state met its "burden with respect to [its] protective custody request." Cynthia now appeals this order.

## ASSIGNMENTS OF ERROR

Restated and reordered, Cynthia assigns the juvenile court erred by (1) finding that continued protective custody of Kaivian in an out-of-home placement was necessary; (2) failing to include in its order a specific finding as to whether reasonable efforts had been made prior to Kaivian's removal; and (3) finding that reasonable efforts to preserve the family had been made prior to his removal.

- 5 -

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017).

ANALYSIS

CONTINUING TEMPORARY PLACEMENT WITH DHHS

Cynthia assigns the juvenile court erred in finding that Kaivian's continued placement out of the home pending adjudication was necessary. She argues there was insufficient evidence to find that Kaivian was at risk of harm in Cynthia's care.

Neb. Rev. Stat. § 43-254 (Cum. Supp. 2020) sets forth the requirements for continuing to withhold a juvenile from his or her parent pending adjudication, and it provides, in part, as follows:

> If a juvenile has been removed from his or her parent, guardian, or custodian pursuant to subdivision (2) of section 43-248, the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under section 43-283.01.

The State must prove the requirements of § 43-254 by a preponderance of the evidence. *In re Interest of Tayla R.*, 17 Neb. App. 595, 767 N.W.2d 127 (2009).

Upon our de novo review, we conclude that the State proved by a preponderance of the evidence that placement with Cynthia would be contrary to Kaivian's health, safety, or welfare. Specifically, we find that Cynthia's failure to alleviate the issues that brought her under the jurisdiction of the juvenile court, her engaging in domestic violence in Kaivian's presence and her continued relationship with Mandy collectively present risks to Kaivian's safety and welfare.

Cynthia's lack of progress in implementing changes in her life poses risks to Kaivian. Cynthia has participated in a series of services including three domestic violence courses, therapy, and supervised visitation. While she completed the domestic violence courses, she was discharged from therapy due to excessive absenteeism and tardiness. Further, the visitation agency that was providing visitation services for her parenting time with her five children stopped providing services due to safety concerns. Specifically, Cynthia was not following through with safety precautions and did not redirect her children's behavior when they were aggressive with each other and visitation workers. Starostka described managing her case as "complete chaos" and cited a number of continuing issues. Most notably, despite her completion of the domestic violence courses, Cynthia continued to have contact with Mandy. These issues illustrate her lack of progress in implementing lessons gained from these services and signify that Cynthia does not comprehend the safety risks involved in maintaining unhealthy relationships. While these issues alone may not present sufficient risks to Kaivian's health, safety, or welfare to warrant continued protective custody, they provide a foundation for more precarious behavior; most notably, the threat posed by Cynthia's continued relationship with Mandy.

Beyond serving as an example of Cynthia's lack of progress in implementing changes in her life, her relationship with Mandy poses a definite risk to herself and to Kaivian. The Nebraska

Supreme Court has stated, "[I]f a child observed the subsequent results of domestic violence or was otherwise made aware of the domestic violence, this could constitute a risk for harm to the child." *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 316, 903 N.W.2d 651, 660-61 (2017). While it is not clear whether Kaivian was present during the August 23, 2022, incident involving the car accident, he was present for the July 31 incident where Mandy broke a window to enter Cynthia's home. This incident obviously posed certain risks to Kaivian at the time it was carried out, but it is the ongoing risk of future incidents, given Cynthia's continued relationship with Mandy, that presents risks to Kaivian's safety and welfare. Despite being involved in two domestic violence incidents that required law enforcement intervention, Cynthia continues to have contact with Mandy. She maintained contact with Mandy after Kaivian was removed from her home, while Mandy was in jail, and after she was released. She even continued contact and allowed Mandy to watch Kaivian alone while there was a no-contact order in place after the July 31 incident. Cynthia's continued relationship with Mandy presents obvious risks to herself and to Kaivian that raises valid questions as to Kaivian's future safety and welfare. As such, we find the State met its burden to demonstrate, by a preponderance of the evidence, that placement with Cynthia would be contrary to Kaivian's health, safety, or welfare.

### REASONABLE EFFORTS

Cynthia assigns the juvenile court erred when it did not make a specific finding that reasonable efforts had been made to preserve the family prior to Kaivian's removal from the home and by finding that the State met its burden to show that reasonable efforts were made.

In the juvenile court's March 17, 2023, order, it did not specifically mention whether reasonable efforts were made prior to Kaivian's removal. Instead, the order broadly found "that the [S]tate [met its] burden with respect to [its] protective custody request." We find the court's broad language sufficiently encompassed a written determination that reasonable efforts were made to preserve and reunify the family in accordance with § 43-254.

We also find the State presented adequate evidence that reasonable efforts were made. Prior to removing a child from their parental home, Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2022) requires that "reasonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care to prevent or eliminate the need for removing the juvenile from the juvenile's home and to make it possible for a juvenile to safely return to the juvenile's home." Meanwhile, § 43-283.01(1) provides that "In determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern."

The State's evidence demonstrated that reasonable efforts had been made to prevent Kaivian's removal. Since Kaivian's birth, Cynthia has been offered a multitude of services and resources. These included time at a treatment center, case management services, foster care placement, domestic violence courses, therapeutic treatment, and supervised visitation. As such, on five prior occasions, the juvenile court found that reasonable efforts were being made in regard to reunification. With many of these services still offered to Cynthia when Kaivian was removed from her home, we conclude that reasonable efforts were made prior to Kaivian's removal.

## CONCLUSION

We find the State met its burden to demonstrate, by a preponderance of the evidence, that placement with Cynthia would be contrary to Kaivian's health, safety, or welfare and that reasonable efforts were made prior to his removal.

AFFIRMED.